IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

SUZANNE D. DAVIS,

       **Plaintiff,**

*vs.*                      **Civil Action No. 5:14CV83**
                                **(The Honorable Frederick P. Stamp, Jr.)**

COMMISSIONER OF SOCIAL SECURITY,

       **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

Suzanne D. Davis ("Plaintiff") brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), to obtain judicial review of a final decision of the Commissioner of Social Security ("Defendant" and sometimes "Commissioner") denying her claims for Supplemental Security Income ("SSI") and Disability Insurance Benefits ("DIB") under Titles XVI and II, respectively, of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f. The matter is awaiting decision on cross motions for summary judgment and has been referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

### I. Procedural History

Plaintiff filed an application for SSI on December 20, 2010, and an application for DIB on December 9, 2010, alleging disability since September 15, 2008, due to bipolar disorder and chronic hepatitis C[1] (R. 178-83, 212). The state agency denied Plaintiff's applications initially and on reconsideration (R. 93-101, 114-27). Plaintiff requested a hearing, which Administrative Law Judge

---

[1] The ALJ found that Plaintiff suffered solely from mental impairments. In her brief, Plaintiff only focuses on medical evidence of mental impairments. Accordingly, the undersigned has only included evidence regarding mental impairments in the statement of facts.

Kim Soo Nagle ("ALJ") held on August 20, 2012, and at which Plaintiff, represented by counsel, Anthony Rogers, and Susan Entenberg, a vocational expert ("VE") testified (R. 44-92, 128-29). On January 18, 2013, the ALJ entered a decision finding Plaintiff was not disabled (R. 23-38). Plaintiff timely filed a request for review of the ALJ's decision with the Appeals Council (R. 16-19). On May 5, 2014, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-5).

## II. Statement of Facts

Plaintiff was born on March 4, 1978, and was thirty-four (34) years old at the time of the administrative hearing (R. 176). Plaintiff's education included one (1) year of college. Plaintiff had past work as a cashier, factory laborer, hair cutter, short order cook, and waitress (R. 213).

Plaintiff presented to Dr. Thomas on April 2, 2007, for a psychiatric evaluation. Plaintiff reported panic attacks, reduced sleep, depression, low energy, and reduced appetite. Plaintiff reported she "used to love being around people" but had recently "been shutting self in." Plaintiff stated she had "moments where she [would] clean the whole house instead of sleeping." Plaintiff stated she smoked marijuana daily. Plaintiff stated she had "'real high moments'" and racing thoughts. She went on spending sprees. She had low motivation. Dr. Thomas found Plaintiff was alert and oriented, times four (4). Her mood was "ok." Her GAF was 50. He diagnosed bipolar disorder and cannabis abuse. He prescribed Seroquel (R. 298).

On September 12, 2007, Plaintiff presented to Dr. Thomas with complaints of feeling "shaky" due to medication. Plaintiff had not been treated by Dr. Thomas since April, 2007. She stated she smoked "pot [occasionally] still." She had not medicated with Seroquel for "a few months." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was

oriented as to person, place, time and situation. Plaintiff described her mood as "tired." Dr. Thomas found Plaintiff's affect was appropriate, thought content was normal, and thought process was linear. Plaintiff's insight and judgment were fair. Dr. Thomas diagnosed bipolar disorder and cannabis abuse; her GAF was 50. Dr. Thomas prescribed Seroquel and instructed Plaintiff to stop smoking marijuana (R. 297, 644).

Plaintiff reported to Dr. Thomas on October 17, 2007, that she had difficulty sleeping. Seroquel made her "legs feel funny." Plaintiff stated she felt "better" and her moods had been "ok." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented times four (4). Her mood was "good." Dr. Thomas found Plaintiff's affect was appropriate, thought content was normal, and thought process was linear. Her insight and judgment were fair. Dr. Thomas diagnosed bipolar disorder and cannabis abuse, found her GAF was 60, and prescribed Ambien and Seroquel (R. 296, 645).

Plaintiff was treated by Dr. Thomas on January 15, 2008. Plaintiff reported Ambien "made her to (sic) weird things in her sleep." Seroquel caused restless leg syndrome. Plaintiff reported she had been "very irritable recently and almost hurt her son." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. Plaintiff described her mood as "miserable." Dr. Thomas found Plaintiff's affect was appropriate, thought content was normal, and thought process was linear. Plaintiff's insight and judgment were fair. Dr. Thomas diagnosed bipolar disorder and cannabis abuse; her GAF was 50; he prescribed Depakote, Klonopin, and Seroquel (R. 294-95, 646).

On February 13, 2008, Plaintiff informed Dr. Thomas that, at the end of January, 2008, she had been "doing well for 2 weeks then her ex called and upset her and she cut her self (sic)."

3

Plaintiff reported that, at the present time, she was doing well. Her sleep was "good." Plaintiff stated her "irritability with her son ha[d] gotten better" and her sister helped her care for her son. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. Plaintiff described her mood as "pretty good." Dr. Thomas found Plaintiff's affect was appropriate, thought content was normal, and thought process was linear. Plaintiff's insight and judgment were fair. Dr. Thomas diagnosed bipolar disorder and cannabis abuse; her GAF was 55. Dr. Thomas instructed Plaintiff to continue medicating with Klonopin, Depakote, and Seroquel (R. 293, 647).

Plaintiff presented to Dr. Thomas on March 14, 2008, with complaints of poor appetite due to her having been ill. Plaintiff stated she had had "some moments but no more cutting or severe swings." Plaintiff stated "things [were] going pretty well so far." She had not had any problems with her "ex." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. Plaintiff described her mood as "pretty good." Dr. Thomas found Plaintiff's affect was appropriate, thought content was normal, and thought process was linear. Plaintiff's insight and judgment were fair. Dr. Thomas diagnosed bipolar disorder and cannabis abuse. Her GAF was 55. Dr. Thomas instructed Plaintiff to continue medicating with Klonopin, Depakote, and Seroquel (R. 292, 648).

Plaintiff presented to Dr. Thomas on May 13, 2008, with complaints of irritability and nervousness. Plaintiff's sleep had improved. Plaintiff stated the medication "seem[ed] to be doing alright." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. Dr. Thomas found Plaintiff's affect was appropriate, thought content was normal, and thought process was linear. Plaintiff's insight and judgment were

fair. Dr. Thomas diagnosed bipolar disorder and cannabis abuse. He prescribed Depakote (R. 291, 649).

Plaintiff reported to Dr. Thomas, on October 2, 2008, that she had "been able to afford the Seroquel only." She had not medicated with Depakote for two (2) weeks. She was irritable and had difficulty sleeping. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. Plaintiff described her mood as "not a good day today." Dr. Thomas found Plaintiff's affect was appropriate, thought content was normal, and thought process was linear. Plaintiff's insight and judgment were fair. Dr. Thomas diagnosed bipolar disorder and cannabis abuse. He prescribed Depakote and Klonopin (R. 290, 650).

Dr. Thomas evaluated Plaintiff on November 6, 2008. Plaintiff reported she had no transportation. She had not taken her medication for two (2) weeks. She "had some [medication] in a truck that got broken into" and stolen. Plaintiff had difficulty sleeping. Dr. Thomas found Plaintiff's mood was poor; Plaintiff described her mood as "I don't know . . . [I]'m here." Dr. Thomas found Plaintiff was appropriately dressed; her eye contact was good; and she was oriented as to place, person, time, and situation. Her affect was flat. Plaintiff's thought content was normal and thought process was linear. She had no suicidal or homicidal thoughts or ideations; she had no visual or auditory hallucinations. Her insight and judgment were fair. Plaintiff was positive for bipolar disorder and cannabis abuse. Her GAF was 55. Dr. Thomas prescribed Seroquel, Klonopin, Depakote (R. 289, 308, 651).

Tracy L. Cosner-Shepherd, M.S., completed a Mental Status Examination of Plaintiff for the West Virginia Disability Determination Service on January 12, 2009. Ms. Cosner-Shepherd noted Plaintiff was dressed casually, she wore glasses, she had visible tattoos, and her eyebrow was

pierced. Plaintiff drove to the evaluation. Ms. Cosner-Shepherd noted Plaintiff's psychomotor behavior was within normal limits; she had no difficulty ambulating. Plaintiff reported she had a two (2) year old son and had no stable living arrangement. Plaintiff had no income. She stated she applied for disability benefits because she was "bipolar. [She could not] keep a job . . . Can't seem for things to go right . . . [Her] body hasn't held up" (R. 300). Plaintiff reported she had experienced bipolar symptoms when she was a teenager, her symptoms interfered with her working, and she had not worked since 2008. Plaintiff listed the following symptoms: she did not like to be around people because she became nervous; she had panic attacks; nervousness caused her to be forgetful; she was irritable with people and "snap[ped] at them"; she experienced depression for a week at a time and then the depression stop; she had difficulty sleeping and had "gone months before without sleeping"; she occasionally isolated herself from others; she experienced nightmares occasionally; she wanted "things to be done" her way; she liked things to be in a certain order; her appetite was diminished and she had lost between fifty to sixty (50-60) pounds during the past year; she had crying spells; she had attempted suicide; her energy level vacillated; she cleaned when she had energy; she did not finish tasks she started; and she had difficulty with concentration, focus, and memory (R. 301). Plaintiff reported she had been "in and out" of mental health counseling since she was fourteen (14) years old. She attempted suicide when she was nineteen (19) years old and had been hospitalized therefor (R. 301).

Plaintiff reported she did not drink alcoholic beverages "often." She had had a "problem" with alcohol, but "cut back after she had her son." Plaintiff reported she used to drink on weekends and consumed one (1) case of beer each day over the weekend. Plaintiff reported she had used heroin, had stopped using heroin, had relapsed and had used it regularly for the past year. Plaintiff also stated she used marijuana, cocaine, ecstasy, acid, and meth and had used these drugs "on and

off" since her early twenties. Plaintiff, at the time of the evaluation, was participating in a methadone program for her heroin addiction (R. 302).

Plaintiff stated she had learning disabilities; she had no writing or reading difficulties; she had to repeat ninth grade; she made average grades. After graduating high school, Plaintiff enrolled in a beauty academy. She was four (4) months "shy of graduation," and she dropped out because she was "raped." Plaintiff reported she had had seven (7) jobs during the past year (R. 302). In her past work, Plaintiff reported she had been fired at times and, at other times, she would "get upset and quit . . . or walk out." Plaintiff reported she had been molested by a neighbor when she was four (4) years old. She had been charged with a misdemeanor possession offense in the past (R. 303).

Upon examination, Ms. Cosner-Shepherd found Plaintiff was cooperative. She maintained good eye contact and gave appropriate answers; her speech was relevant and a "bit" monotone; she was oriented, times four (4); her mood was downcast; her affect was restricted; and her thought process was normal. Ms. Cosner-Shepherd noted, relative to Plaintiff's thought content, that "everything" had to "be a certain way and in a certain spot." She did not like people to touch her things. She became "paranoid" when others entered her work station. If anyone moved or touched "things," Plaintiff felt as if something bad would happen. She was frightened of spiders (R. 303). Plaintiff denied suicidal ideations, homicidal ideations, illusions, or hallucinations. Ms. Cosner-Shepherd found Plaintiff's insight was fair to average; her judgment was normal; her immediate memory was normal; her recent memory was markedly deficient; her remote memory was normal; her concentration was mildly deficient; and her psychomotor behavior was normal (R. 303-04).

Ms. Cosner-Shepherd diagnosed the following: Axis I - polysubstance dependence, early partial remission; mood disorder, not otherwise specified; and anxiety disorder, not otherwise

specified; Axis II - personality disorder, not otherwise specified; and Axis III - "bad knees, bad wrists due to carpal tunnel, and back problems" (R. 304). Ms. Cosner-Shepherd found Plaintiff's diagnosis of bipolar disorder should be "confirmed" because her "substance use could play a factor in her mood disturbance, as well as her difficulty dealing with past trauma." Ms. Cosner-Shepherd found Plaintiff's prognosis was "fair."

Plaintiff described her "typical" day as follows: rose, cared for her son, went to the methadone clinic, visited her mother, returned to where she was staying, did "chores she ha[d] to do," fed and bathed her son, then put him to bed. Plaintiff reported she cooked and cleaned every day. She did dishes, shopped for groceries twice monthly, and drove daily. Plaintiff visited family daily. She talked on the phone every other day to friends. She sewed and completed puzzles. She did not attend church; she did not belong to clubs or organizations; she did not date (R. 305).

Ms. Cosner-Shepherd found Plaintiff's concentration was mildly deficient, her persistence was normal, and her pace was normal. As noted above, Plaintiff's immediate memory was normal, her recent memory was markedly deficient, and her remote memory was normal (R. 305-06). Ms. Cosner-Shepherd found Plaintiff could manage funds (R. 306).

Plaintiff presented to Dr. Thomas on February 4, 2009, with complaints of "doing worse." She did not want to "go out in public." Her memory was impaired because "racing thoughts never stop." Plaintiff reported she could not "hold a job" and that she had "lost the last one for cussing a customer." Plaintiff had been sleepwalking. Seroquel made her "legs feel funny." She "sometimes" had "too much energy." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "anxious." Dr. Thomas

found Plaintiff's affect was congruent and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed bipolar disorder and prescribed Risperdal, Klonopin, and Depakote. Dr. Thomas encouraged Plaintiff "to find a PCP" (R. 37-71, 652-53).

Plaintiff presented to Dr. Thomas on March 4, 2009, with complaints of moodiness and irritability. Plaintiff stated Risperdal "helped her sleep." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "cranky." Dr. Thomas found Plaintiff's affect was congruent and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed bipolar disorder and prescribed Klonopin and Depakote (R. 372-73, 654-55).

Plaintiff presented to Dr. Thomas on April 3, 2009, with memory impairment, which could have been caused by her "mother nagging her all the time." Plaintiff had no other complaints; her sleep was great; she was doing well. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "pretty good." Dr. Thomas found Plaintiff's affect was congruent and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed bipolar disorder and prescribed Klonopin, Risperdal and Depakote (R. 374-75, 656-57).

Plaintiff presented to Dr. Thomas on June 4, 2009, with complaints of mood swings, poor

sleep, and anger. Plaintiff reported she had completed the methadone clinic and had been heroin free for two (2) months. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented, times four (4). She was not suicidal, homicidal, or paranoid. Plaintiff described her mood as "alright." Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed bipolar disorder; her GAF was 50. Dr. Thomas prescribed Risperdal, Klonopin, and Depakote (R. 310, 376, 658-59).

Plaintiff reported to Dr. Thomas on July 16, 2009, that her prescription medications were "missing" and she thought "someone got into her vehicle and took them." Plaintiff had not taken her medications for six (6) weeks. She had been "a mess." Plaintiff reported she would not leave the house, was depressed, and was anxious. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "a mess." Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed bipolar disorder and prescribed Risperdal, Klonopin and Depakote (R. 378). Dr. Thomas noted Plaintiff could not "get therapy because of not having the enhanced medical card plan" and told her to "check with DHHR" (R. 379, 660-61).

Plaintiff reported to Dr. Thomas on August 21, 2009, that she was taking her medications on a regular basis and had occasional panic attacks but was "otherwise . . . doing ok." Her sleep was interrupted by her child. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or

paranoid. She had no hallucinations. Plaintiff described her mood as "kinda depressed as I have to go to a funeral." Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed bipolar disorder and prescribed Risperdal, Klonopin and Depakote (R. 380, 662-63).

Plaintiff was treated by Dr. Thomas on March 26, 2010; she had not been treated by Dr. Thomas since August, 2009. Plaintiff had "been without her meds for a few months." Her mood was "not . . . doing very well." Plaintiff's sleep was "off and on." She was anxious due to her relationship with her ex-boyfriend. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "not very good." Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed bipolar disorder and prescribed Risperdal, Klonopin and Depakote (R. 382, 664-65).

Plaintiff presented to Dr. Thomas on June 3, 2010, with complaints of poor sleep. Plaintiff reported she was a "mess" and "they [were] trying to get her for a DUI but nothing was in her system." She was "more depressed" and "more manic" during the past two (2) weeks. Plaintiff reported that Buspar "helped her." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "depressed." Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed.

Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed bipolar disorder and prescribed Buspar, Risperdal, Klonopin and Depakote (R. 384, 666-67).

Plaintiff reported to Dr. Thomas on July 6, 2010, that she was "doing pretty well" on Buspar. She did not feel "as sluggish and [was] doing better.' Her sleep was "still not good." She would not sleep for three (3) days due to racing thoughts. Her sleeplessness was exacerbated by stress. Plaintiff stated "Ambien" had "helped" in the past. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "crappy." Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed bipolar disorder and prescribed Buspar, Risperdal, Klonopin, Ambien, and Depakote (R. 386-87, 668-69).

On July 21, 2010, Plaintiff began mental health care at Mountain State Psychological Services. At her intake appointment, Plaintiff stated she desired to undergo therapy. She stated she experienced panic attacks as often as once daily. She had a racing heart, shaking, sweating, clamminess, and trembling. She was not anxious when she was "isolated." Plaintiff reported she was nervous in public, in large groups of people, and around people she did not know. Plaintiff reported she was depressed daily and had been depressed "most of life." She lacked energy, slept, cried, and had suicidal thoughts and attempts in the past. Plaintiff reported that previous attempts to resolve her symptoms had been successful in that she saw "noticeable progress" (R. 313, 692). Plaintiff reported she was single; she had been pregnant four (4) times and has miscarried three (3)

12

times (R. 314, 693). Plaintiff reported she did not have many friends, and it "would not be bad to have more friends." She stated she completed one (1) year of college/beauty school. She had been expelled from school for being intoxicated. Plaintiff had been arrested for marijuana possession in the past. Plaintiff stated she had not undergone any psychological testing (R. 315, 694).

Plaintiff reported she had been employed and was scheduled to start work as a beautician on August 3, 2010. She received child support from her son's father. Plaintiff stated she had high triglycerides and cholesterol and she was borderline diabetic (R. 316, 695).

Plaintiff reported she had attempted suicide six (6) times, but the "gun jammed." She twice attempted suicide by cutting her wrists and taking pills. Plaintiff reported she was verbally aggressive twice weekly. She had thrown "things" and made holes in walls. She had been in a bar fight three (3) years earlier. Plaintiff reported her former boyfriend had subjected her to physical, mental, and sexual abuse; she had been molested when she was four (4) years old by a neighbor. Plaintiff stated an uncle had been murdered and she witnessed domestic violence between her grandparents (R. 317, 696). She reported she had been addicted to heroin for three (3) years. She had not used heroin for ninety (90) days and had not drunk alcohol in four (4) years (R 318, 697).

Upon examination, it was observed that Plaintiff was oriented, times four (4); she was alert; her appearance was appropriate; her thought orientation was intact; she had no delusions or hallucinations; her affect was nervous; her mood was depressed and anxious; she had no suicidal or homicidal ideations or thoughts; her impulse control was mixed; her psychomotor behavior was restless; her sleep was normal; her appetite was not normal in that she had lost fifty (50) pounds; her eye contact was good; her speech was normal; she had no substance abuse behavior; and she had no self-injury behavior (R. 318, 698). Plaintiff's prognosis was found to be guarded and it was the

opinion of the interviewer that, due to Plaintiff's history of "opioid dependence and minimal support systems," she may not be able to "maintain long-term behavioral change." Plaintiff was diagnosed with dysthymic disorder, social phobia, generalized anxiety disorder, and opioid dependence in full remission. It was recommended that Plaintiff undergo psychological testing, family therapy, and individual therapy (R. 319, 699).

On July 29, 2010, Psychologist Henchey and Psychologist Snoberger, of Mountain Sate Psychological Services, completed psychological testing of Plaintiff. They noted the following: she was oriented, times four (4); she was alert; her appearance was appropriate; her thought disturbance was intact; she had no hallucinations or delusions; her affect was downcast; her mood was depressed; she was not suicidal or homicidal; her impulse control was good; her psychomotor behavior was intact; her memory was intact; her sleep was normal; her appetite was normal; her eye contact was fair; her speech was soft; and she was not abusing drugs (R. 402).

On the Minnesota Multiphasic Personality Inventory-2 ("MMPI-2"), Plaintiff's codetype was "1-8/8-1(7)." As to her mood, it was found she was "experiencing moderate to severe emotional distress characterized by dysphoria, anxiety, agitation, and anhedonia." Plaintiff was "chronically stressed" and became more agitated and withdrawn as her stress increased. Her cognitive thought processes "suggested she has concentration and memory difficulties and she [was] easily distracted and confused" (R. 402, 688). She lacked self confidence. She may have been "bothered by strangers looking at her critically." She heard "strange things when she" was alone. She obsessed and ruminated about her feelings. Plaintiff reported "a number of symptoms that may reflect a psychotic process or a very long-term, characterlogic condition." Plaintiff had difficulty talking to "new people." Plaintiff experienced pain and neurologic symptoms, which may have "border[ed] on being

delusional." The results of the MMPI-2 "suggest[ed]" Plaintiff's prognosis was "generally poor." "Psychopharmacologic interventions [would] be beneficial to help her cope with her dysphoria, agitation, and sleep difficulties." Plaintiff's chances to achieve "long-term change" were low. Plaintiff scored in the "severe range" in the hopelessness, suicidal ideation, negative self-evaluation, and hostility categories (R. 403, 689).

Plaintiff's scores on the The Substance Abuse Subtle screening Inventory-3 ("SASSI-3") showed she had a "'[h]igh [p]robability'" of having a substance dependence disorder. Plaintiff score on the Beck Depression Inventory II ("BDI-II") showed severe depression (R. 404, 689).

Psychologists Henchey and Snoberger recommended Plaintiff undergo further therapy (R. 405, 691).

Plaintiff was diagnosed with insomnia, anxiety, and bipolar disorder by Dr. Thomas on August 3, 2010. He prescribed Risperdal, Depakote, Klonopin, Buspar, and Ambien (R. 388).

Plaintiff presented to Dr. Thomas on December 29, 2010; she had not been to his office since July, 2010. Plaintiff's mood had not been "very good." Plaintiff had not been leaving the house or talking to people. She was depressed. Plaintiff reported she had been treated by Dr. Miller, who prescribed Celexa, which "didn't help. Otherwise [she had] been without mood stabilizers." Plaintiff reported her symptoms were depression, mania, racing thoughts, and irritability. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "ok." Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed

insomnia, anxiety, and bipolar disorder and prescribed Venlafaxine, Risperdal, Klonopin, Ambien, Buspar, and Depakote (R. 389-90, 422-23, 670-71).

Psychologists at Mountain State Psychological Services completed a Routine Abstract Form - Mental of Plaintiff on January 5, 2011. It was noted Plaintiff completed the MMPI-2 in July, 2010 (R. 398). Plaintiff's speech was normal; she was oriented times four (4); she was mildly paranoid; she had no hallucinations, suicidal ideations, or homicidal ideations; her judgment was normal; her affect was flat; her mood was depressed and anxious; perception was normal; her insight was mildly deficient; her thought content was normal; and her psychomotor activity was normal (R. 399). Plaintiff's immediate and recent memories were normal; social functioning was moderately deficient; concentration was mildly deficient; task persistence was moderately deficient; and pace was normal. Plaintiff medicated with Effexor, Risperdal, Depakote, Klonopin, Buspar, and Ambien (R. 400). Her diagnoses were generalized anxiety, dysthymic, and bipolar disorders (R 401).

Plaintiff reported to Dr. Thomas on January 21, 2011, that she had "started to feel a bit better." Plaintiff stated the medication "[f]elt like it started to help but then quit." She had "no desire" to go in public and she was more isolated. She slept for four (4) hours when she medicated with Ambien. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "blah." Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Dr. Thomas diagnosed insomnia, anxiety, and bipolar disorder and prescribed Venlafaxine, Klonopin, Ambien, Buspar, and Depakote (R. 424-25, 672-73).

Plaintiff reported to Dr. Thomas, on March 2, 2011, that the increased dosage of Effexor "helped a bit." She felt better because she was not taking the Risperdal. Her sleep was "really good" without Ambien. Plaintiff stated she had recently had an automobile accident and was afraid to drive; she was "working" on overcoming her fear. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented times four (4). She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "pretty good." Dr. Thomas found Plaintiff's affect was improved and thought process was linear and goal directed. Her insight was fair, judgment was poor, and immediate, recent, and remote memories were intact. Dr. Thomas diagnosed insomnia, anxiety, and bipolar disorder and prescribed Venlafaxine, Klonopin, Ambien, Buspar, and Depakote. Her GAF was fifty-five (55) (R. 426-27, 674-75).

Tracy L. Cosner-Shepherd, M.S., completed a Mental Status Examination for the West Virginia Disability Determination Service of Plaintiff on April 13, 2011. Plaintiff stated she had "'emotional issues, bipolar . . . chronic hepatitis C" (R. 595). Plaintiff stated she did not "do well with the public." She had "anxiety attacks" when she went to the store. Her sleep was "'out of whack.'" She had nightmares about events from when she was young. She needed medication to sleep. She had little appetite; she had lost fifty (50) pounds in four (4) months. She cried, was depressed, lacked energy, was agitated, had memory difficulties, and had difficulty concentrating. Plaintiff reported she had been undergoing mental health therapy "on and off for the last two years." Plaintiff had attempted suicide when she was nineteen (19) and had been hospitalized. She was positive for hepatitis C and was a borderline diabetic. Plaintiff smoked a package of cigarettes per day. Plaintiff medicated with Effexor, Depakote, Ambien, Klonopin, and Buspar (R. 596). Plaintiff stated she drank "on occasion." More than once or twice monthly, she had a "few drinks." Plaintiff

stated she once drank every other day; that habit lasted for four (4) years. Plaintiff had used heroin daily for three (3) years. She was trying to "kick the habit" for the past six (6) months. She had not used heroin during the past two (2) weeks. Plaintiff had used marijuana, cocaine, methamphetamine, ecstasy, acid, mushrooms, and "various prescription pain medications." Plaintiff had undergone in-patient drug treatment at the John D. Good Center "last May"; she had been there for twelve (12) days and had gone through the "'suboxin'" program. She had gone to a methadone clinic two (2) years ago. She had been arrested last year for driving under the influence (R. 597).

Plaintiff reported graduating high school, having repeated the ninth grade, going to summer school, and getting "'horrible'" grades. She was a member of the FHA and FFA clubs. After graduation, she had "two years of cosmetology . . . and received certification." She had completed "some college coursework." She last worked three (3) years earlier. Plaintiff had been fired from a factory job because of her "'mouth.'" She had some "difficulties with coworkers and supervisors." Plaintiff had applied for jobs, but had not "had luck in getting hired" (R. 597).

Upon examination, Ms. Cosner-Shepherd found Plaintiff was cooperative. She maintained good eye contact and gave adequate answers to the questions (social); speech was relevant and a "bit" monotone; she was oriented, times four (4); her mood was neutral; her affect was restricted; and her thought process was normal. Ms. Cosner-Shepherd found, relative to Plaintiff's thought content, that she was afraid to drive due to an accident. Plaintiff reported some obsessive/compulsive tendencies with cleaning. She cleaned daily; she cleaned her bathroom after she used it. Plaintiff denied suicidal ideations, homicidal ideations, illusions, or hallucinations. Ms. Cosner-Shepherd found Plaintiff's insight was fair; her judgment was normal; her immediate memory was normal; her recent memory was moderately deficient; her remote memory was normal; her concentration was

mildly deficient; and her psychomotor behavior was normal (R. 598).

Ms. Cosner-Shepherd diagnosed polysubstance dependence; mood disorder, not otherwise specified; anxiety order, not otherwise specified; personality disorder, not otherwise specified; and hepatitis C and borderline diabetes. Plaintiff's prognosis was "fair" (R. 598-99).

Plaintiff listed the following activities of daily living: "[got] her son off to school"; watched television; cleaned the bathroom twice daily; met her son at the school bus; gave her son dinner; bathed her son; put her son to bed; stayed up all night; cooked every day; did not wash dishes; cleaned "some" every day; did laundry once weekly; did not do yard work; grocery shopped twice a month; did not drive; and walked twice a week (R. 599). Ms. Cosner-Shepherd found Plaintiff's pace was normal. She could manage her own finances (R. 600).

On April 23, 2011, Debra Lilly, Ph.D., completed a Psychiatric Review Technique of Plaintiff. Dr. Lilly found Plaintiff's impairments, stemming from an affective disorder, an anxiety-related disorder, a personality disorder, and a substance addiction disorder, were not severe (R. 408-17). Dr. Lilly found Plaintiff had mild limitations in her activities of daily living, ability to maintain social functioning, and ability to maintain concentration, persistence or pace. Plaintiff had had one or two (1-2) episodes of decompensation (R. 418). Dr. Lilly found Plaintiff periodically engaged in substance abuse, she was not consistent with her treatment, and she was not credible (R. 420).

On May 26, 2011, Plaintiff informed Dr. Thomas that she was "a mess"; she had been taking her medications. She was depressed and did not want to "do anything." She did not want to leave her house. She was irritable. She had experienced manic episodes recently. Plaintiff stated her counseling at Mountain State Psychological Services "help[ed]." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation.

She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "pretty good." Dr. Thomas found Plaintiff's affect was improved and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Her immediate, recent, and remote memories were intact. Dr. Thomas diagnosed insomnia, anxiety, and bipolar disorder and prescribed Cymbalta, Depakote, Klonopin, and Buspar (R. 428-29, 576-77, 676-77).

On August 23, 2011, Bob Marinelli, Ed.D., reviewed the "file" and affirmed Dr. Lilly's April 23, 2011, assessment (R. 602).

On August 24, 2011, Plaintiff informed Dr. Thomas that she had gained twenty (20) pounds in two (2) weeks due to Cymbalta. She was not taking any medication. She did not see a "change in her mood." Her sleep was poor. She was anxious and depressed. She did not want to leave her house. She "worried all the time." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "'not that good.'" Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Her immediate, recent, and remote memories were intact. Plaintiff's GAF was fifty (50). Dr. Thomas diagnosed insomnia, anxiety, and bipolar disorder and prescribed Prozac, Depakote, Klonopin, and Buspar (R. 578-79, 678-79).

On December 9, 2011, Plaintiff informed Dr. Thomas that she was unsure if Prozac was "helping." Plaintiff stated she was agitated, irritated, tearful, shaky, and panicky. Her sleep was poor. Plaintiff reported a friend may have committed suicide and people were "spreading rumors" that Plaintiff had sold the individual heroin. Plaintiff was not medicating with Suboxone and was having problems with alcohol. Dr. Thomas found Plaintiff was appropriately dressed, had good eye

contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "'[I]'m here.'" Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Plaintiff's GAF was fifty (50). Dr. Thomas diagnosed insomnia, anxiety, and bipolar disorder and prescribed Trazadone Hydrochloride, Prozac, Ativan, Depakote, Buspar, and Ambien (R. 580-81, 680-81).

On February 28, 2012, Plaintiff informed Dr. Thomas that her sleep had improved with Trazadone. "Mood wise, nothing [was] working." Plaintiff stated she was "snappy," "nervous," tearful, and did not want to leave the house. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "'depressed and anxious'" Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Plaintiff's GAF was fifty (50). Dr. Thomas diagnosed insomnia, anxiety, and bipolar disorder and prescribed Xanax, Wellbutrin, Prozac, Depakote, Trazadone Hydrochloride, and Ativan (R. 582-83).

On April 9, 2012, Plaintiff informed Dr. Thomas that someone had "robbed her house" and had stolen her medications. Her mood was "about the same." Child Protective Service "took her child." Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "'I'm here.'" Dr. Thomas found Plaintiff's

affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Plaintiff's GAF was 50. Dr. Thomas diagnosed insomnia, anxiety, and bipolar disorder and prescribed Xanax, Wellbutrin, Prozac, Depakote, Trazadone Hydrochloride, and Ativan (R. 584-85).

Dr. Thomas completed a Mental Impairment Questionnaire of Plaintiff on April 9, 2012. He listed her diagnoses as bipolar disorder; anxiety, not otherwise specified; and insomnia. He listed her GAF as 50. Dr. Thomas listed the following as Plaintiff's symptoms: poor memory, appetite disturbance with weight change, social withdrawal, mood disturbance, emotional lability, anhedonia or pervasive loss of interests, feelings of guilt or worthlessness, difficulty thinking or concentrating, sleep disturbance, personality change, blunt or flat affect, decreased energy, manic symptoms "sometimes," generalized persistent anxiety, and hostility and irritability (R. 431). Dr. Thomas listed the following "clinical findings": "results of mental status examinations"; "alert x 4, mood 'I'm here[,]' affect: blunted . . . ." Dr. Thomas opined Plaintiff was not a malingerer and her impairments were "reasonably consistent with" her symptoms. Dr. Thomas wrote the following for "treatment and response": "med adjustments [with] mood improvements @ times. Currently down." He listed Plaintiff's prognosis as "fair." Dr. Thomas noted Plaintiff's impairments had been present "all [her] life" and were expected to last at least twelve (12) months (R. 432). Dr. Thomas found Plaintiff's impairments or treatments would cause her to be absent from work more than three (3) times per month (R. 433).

In the Mental Abilities to do Unskilled Work category, Dr. Thomas found Plaintiff had a fair ability to understand and remember very short and simple instruction, carry out very short and simple instructions, make simple work-related decisions, perform at a consistent pace without an

unreasonable number and length of rest periods, ask simple questions or request assistance, accept instructions and respond appropriately to criticism from supervisors, and be aware of normal hazards and take appropriate precautions. He found Plaintiff had poor or no ability to remember work-like procedures, maintain attention for two (2) hours, maintain regular attendance, be punctual, work in coordination with or proximity to others without being unduly distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms, get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, respond appropriately to changes in a routine work setting, and deal with normal work stress (R. 433-34). In the Mental Abilities and Aptitudes Needed to do Semiskilled and Skilled Work category, Dr. Thomas found Plaintiff had a fair ability to set realistic goals, make plans independently of others, and deal with stress of semiskilled and skilled work. He found Plaintiff had poor or no ability to understand and remember detailed instructions or carry out detailed instructions. In the Mental Abilities and Aptitudes Needed to do Particular Types of Jobs, Dr. Thomas found Plaintiff's ability to adhere to basic standards of neatness and cleanliness was good. She had a fair ability to interact appropriately with the general public, maintain socially appropriate behavior, travel in unfamiliar places, and use public transportation (R. 434).

Dr. Thomas found Plaintiff was markedly limited in her activities of daily living, ability to maintain social functioning, and in concentration, persistence, or pace. Dr. Thomas noted Plaintiff had experienced four (4) episodes of deterioration (R. 434). Dr. Thomas found Plaintiff could manage benefits. He found Plaintiff was not currently abusing alcohol or illegal drugs (R. 435).

On March 8, 2012, Plaintiff informed Dr. Thomas that she had lost custody of her son. Plaintiff stated her son was removed from her home because it was "a mess." She wanted her son

returned to her because his father was an alcoholic. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "'Im here.'" Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Plaintiff's GAF was 50. Dr. Thomas diagnosed insomnia, anxiety, and bipolar disorder and prescribed Xanax, Wellbutrin, Prozac, Depakote, Trazadone Hydrochloride, and Ativan (R. 586-87).

On August 9, 2012, Plaintiff informed Dr. Thomas that her parents had "disowned her" and would not "speak to her." She had an appointment with a lawyer relative to Social Security disability. Plaintiff reported she had not slept in two (2) days, had cleaned the house in the night, had racing thoughts, was shaky, was panicking, and was tearful. Dr. Thomas found Plaintiff was appropriately dressed, had good eye contact, and was oriented as to person, place, time and situation. She was not suicidal, homicidal, or paranoid. She had no hallucinations. Plaintiff described her mood as "'anxious.'" Dr. Thomas found Plaintiff's affect was blunted and thought process was linear and goal directed. Plaintiff's insight was fair and judgment was poor. Plaintiff's immediate, recent, and remote memories were intact. Plaintiff's GAF was fifty (50). Dr. Thomas diagnosed insomnia, anxiety, and bipolar disorder and prescribed Xanax, Wellbutrin, Prozac, Depakote, Trazadone Hydrochloride, and Ativan (R. 588-89).

Administrative Hearing

At the administrative hearing, Plaintiff testified she had nowhere to live and stayed with acquaintances (R. 54). Plaintiff stated she did not have custody of her six (6) year old son because

she was "mentally not able" to care for him; he was removed from her home by a child protective service worker (R. 56). Plaintiff stated her child may have been removed from her custody and placed in the custody of his father because her house was "a mess" (R. 57). Plaintiff stated she was "in pain most days and lay on the couch for the most part of the day." Plaintiff babysat the children of a friend for an hour every day or every other day (R. 63). Plaintiff "straighten[ed] here and there" at the house where she was staying. Plaintiff "sometimes" watched television; she went to the store once every two (2) or three (3) weeks. She groomed herself and did laundry (R. 64). Plaintiff reported she did not socialize very much with the people with whom she lived because they "stress[ed]" her "out." Her driver's license had been revoked due to fines (R. 65). "[U]sually" someone transported Plaintiff to doctor's appointments (R. 66). She smoked one-half package of cigarettes per day. Plaintiff drank a "beer or two" when she drank; she last drank one (1) month prior to the administrative hearing (R. 68). Plaintiff testified she had a "drug problem"; had been "clean since November"; and had one (1) "set back" in May in that she ingested pain pills. Plaintiff described her drug abuse as using "anything that would come across" her. She did not have a "preference" (R. 69). Plaintiff testified she had used heroin, morphine, and pain pills; she "very occasionally" used cocaine (R. 70). Plaintiff stated she had last smoked marijuana two (2) months prior to the hearing (R. 74-75).

Plaintiff stated she could not work because of social anxiety; she did not get along with people. She had "rages" and became angry with others. She had bipolar disorder and panic attacks. She had post traumatic stress disorder ("PTSD") symptoms (R. 67). Plaintiff medicated with Trazadone, Ambien, Depakote, Wellbutrin, Prozac, and Xanax; she was scheduled to start taking Lithium "soon" (R. 70). Plaintiff stated that the combination of Trazadone and Ambien "sometimes"

helped her sleep.  Trazadone and Depakote caused Plaintiff to have low energy (R. 71, 74).  Ambien caused periodic sleepwalking (R. 72).  She had no side effects to Xanax or Prozac (R. 73, 74).  Plaintiff stated that there had been periods when she did not take her medication, but none lasted more than two (2) months (R. 75).

When questioned by her lawyer, Plaintiff stated she was "lucky" if she took a shower; she no longer put on make up and styled her hair on a daily basis (R. 75-76).  Plaintiff described a "bad" day as follows: ". . .[R]oll over, smoke a cigarette and roll back over.  Just I can't move, I'll cry, I'll lay in a ball and cry" due to mental and physical pains (R. 76).  Plaintiff's good day was as follows: ". . . [W]ake up, smoke, lay there for a little bit, maybe fill the dishwasher or get something to eat and go back to the couch" (R. 78).  Plaintiff stated she did not go to the movies or a mall because there were "too many people in there.  They freak me out . . . I don't like it when people touch me.  I don't like it when they're near me or close to me in line" (R. 77). Plaintiff stated she had no visitors (R. 81). Plaintiff stated her mind "skip[ped] too much to concentrate on anything."  To watch a program on the television, Plaintiff had to be "very interested" in order to pay attention (R. 78).  Plaintiff stated she had no patience with others; she was not interested in people (R. 82).

The ALJ asked the VE the following hypothetical question:

> . . . [A]ssume an individual capable of performing medium exertion, however, the individual has non-exertional mental limitations. And accordingly is limited to simple routine repetitive tasks performed in a work environment free of fast paced production requirements.  And a low stress job involving only simple work related decisions with few, if any, work place changes.  Further, the individual has social functioning limitations and should have no more than occasional interaction with the public.  Given those limitations could such an individual perform any of the jobs in the claimant's past work or any other work? (R. 84-85, 86).

The VE responded Plaintiff could perform her past work as factory worker and the jobs of dishwasher, light housekeeper, and packer (R. 85-86).

The ALJ modified the above hypothetical question to include no interaction with the public and only occasional interaction with coworkers and asked the VE if the above listed jobs were still available to Plaintiff. The VE responded in the affirmative (R. 87-88).

Evidence Submitted to the Appeals Council

Tony Goudy, Ph.D. completed a Psychological Evaluation of Plaintiff on April 19, 2013, and May 3, 2013. Plaintiff reported, relative to her bipolar disorder, that she had experienced manic episodes in the past, some "lasting up to two weeks" (R. 701). She had "feelings of intense grandiosity" and reduced sleep. Plaintiff reported she had been awake for four (4) nights in a row during a manic episode. She had pressured speech, "excessive involvement in risky but pleasurable behaviors," racing thoughts, goal-directed activity, impulse buying, and overindulged in drugs and alcohol. During her depressive episodes, she experienced, loss of interest in sewing and reading, poor sleep, low energy, feelings of guilt and worthlessness, and difficulty concentrating. Plaintiff reported she attempted suicide at the ages of fourteen (14) and nineteen (19) by taking an overdose of drugs. She "slashed her wrists" when she was thirty-one (31). Plaintiff reported she had experienced daily panic attacks in the past; she had them twice a week at the time of the evaluation (R. 702).

Plaintiff stated she had been physically and sexually abused. When asked "why that history [did] not appear to be developed in her mental health records, she adamantly stated that the thoughts of the abuse are so painful she trie[d] to avoid speaking of it as much as she" could (R. 709). Dr. Goudy found that the record lacked details of these incidents because of Plaintiff's "extreme reticence." Plaintiff became "upset during the initial clinical interview" with discussing these events and the interview had to be rescheduled (R. 709). Plaintiff recounted that, at the age of four (4), she was molested by a neighbor and, at the age of nineteen (19), she was "beaten and raped." Plaintiff

reported she had nightly nightmares due to these experiences.  Plaintiff reported that one incident happened in the woods, so she could not "stand the sound of cracking sticks or twigs or the smell of pine."  One incident happened in a quiet room, so Plaintiff could not tolerate "silence" as it drove her "crazy" (R. 702).

Plaintiff reported she had undergone psychotherapy in her early teen years and through high school.  She was not engaged in psychotherapy at the time of the evaluation; however, she had been so engaged in the past as an adult.  Plaintiff reported she medicated with Xanax, Depakote, and Paxil.  Plaintiff stated she had no physical conditions that would "impair her ability to pursue substantial gainful activity."  Plaintiff reported that she had lost custody of her older son; she had a three (3) month old son and she had custody of him.  Plaintiff reported she had graduated high school; she had difficulty reading (R. 704).  Plaintiff stated she had last worked in 2008.  She had held numerous jobs and had been fired from one for "'yelling at the public.'"  Plaintiff stated she had a history of polysubstance dependence, which included prescription medication, heroin, marijuana, and methamphetamine.  Plaintiff had not used any illegal drugs since April, 2012.  She occasionally consumed alcoholic beverages.  Plaintiff reported she had been arrested and charged for possession of marijuana in 2006 (R. 705).

Upon examination, Dr. Goudy found Plaintiff had "significant" psychomotor behavior; she wrung her hand and was "quite fidgety" (R. 705).  Plaintiff was reserved and cooperative.  Plaintiff stated her mood was "'very nervous'"; her affect was blunted.  Plaintiff's speech was relevant and coherent; she had no suicidal ideations; she had no perceptual disturbances; and she was oriented as to time, place, person, and circumstance.  Plaintiff's immediate memory was intact, recent memory was moderately-to markedly impaired, and remote memory was mildly-to-moderately

impaired. Plaintiff's concentration was markedly impaired; her intellectual functioning was average; and her judgment was adequate (R. 706).

Plaintiff's score on the BDI-II showed moderate depression (R. 706). Plaintiff's score on the Beck Anxiety Inventory ("BAI") showed moderate levels of anxiety. Her PDS score showed severe symptoms of PTSD. On the MMPI-2, Dr. Goudy found Plaintiff's score should be "interpreted with caution" because she had difficulty reading, was confused, and was anxious. It showed "a long history of chronic psychological maladjustment" (R. 707). Dr. Goudy found the results "indicated a history of very severe psychopathology" (R. 708).

Dr. Goudy made the following diagnoses: Axis I - chronic PTSD; bipolar disorder, severe and without psychotic features; panic disorder; and polysubstance dependence in full remission, as per Plaintiff's statement; Axis IV - unemployment and financial problems; and Axis V - GAF of fifty (50) (R. 708). Dr. Goudy found Plaintiff's substance abuse was a "direct product of self-medicating to deal with her history of sexual abuse and her impulsive and irresponsible behaviors . . ." (R. 709). Dr. Goudy further opined that Plaintiff had not reopened her prior Social Security case due to a lack of concentration and difficulty reading. Dr. Goudy assessed Plaintiff under Social Security Listing "12.06A.5" for recurrent and intrusive recollections of traumatic experiences; 12.04 for affective disorders; and 12.07 for anxiety-related disorders. He found Plaintiff suffered from the following B criteria: mild-to-moderate impairment in activities of daily living; marked impairment in social functioning; and marked impairment in concentration (R. 709). Plaintiff had had decompensation in the form of three (3) suicide attempts and one hospitalization. Dr. Goudy found Plaintiff met a Listing. He found that "the increased stress of a return to work would likely result in significant deterioration or even decompensation and the likelihood that she could successfully pursue

substantial gainful activity at this time [was] minimal" (R. 710).

In a letter dated June 27, 2013, Dr. Thomas wrote he had "reviewed and agree[d] wholeheartedly with the evaluation done by Dr. Tony Goudy." Dr. Goudy's findings "correspond[ed] with his thoughts, and [he agreed] with the added diagnosis of PTSD. . ." (R. 711).

## III.  Administrative Law Judge Decision

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. §§ 404.1520 and 416.920,  ALJ Nagle made the following findings:

1.    The claimant meets the insured status requirements of Social Security Act through September 30, 2013.

2.    The claimant has not engaged in substantial gainful activity since September 15, 2008, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3.    The claimant has the following severe impairments (20 CFR 404.1520(c) and 416.920(c): mood disorder, anxiety disorder, personality disorder, and polysubstance abuse disorder (in recent partial remission).

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5.    After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform work at the medium exertional level, as defined in 20 CFR 404.1567(c) and 416.967(c), but subject to the following nonexertional limitations: (a) the work must consist only of simple, routine, and repetitive tasks performed in a low-stress environment, defined as a work environment (i) free of fast-paced production requirements, (ii) involving only simple, work-related decisions, and (iii) with few, if any, workplace changes; and (b) the work must not require interaction with the public, and must not require more than occasional interaction with coworkers.

6.    The claimant is capable of performing past relevant work as a factory laborer. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.    The claimant has not been under a disability, as defined in the Social Security Act, from September 15, 2008, through the date of this decision (20 CFR 404.1520(f) and 416.920(f).

## IV.  Discussion

### A.    Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a jury verdict were the case before a jury, then there is 'substantial evidence.'" Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)).  In reviewing the Commissioner's decision, the reviewing court must also consider whether the ALJ applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B.    Contentions of the Parties

The Plaintiff contends:

1.    Because the ALJ failed to evaluate all of her severe impairments, this Court must remand the case for the calculation of benefits;

2.    Because the ALJ mischaracterized the record when assessing her credibility

and when assessing a treating source opinion, this Court must remand the case for the calculation of benefits as the ALJ circumvented SSR 96-7p and circumvented the "Treating Physician Rule"; and

3.  Because the ALJ used evidence from her prior claim without addressing any re-opening issues, this Court must remand the case as the ALJ performed a de facto reopening of the prior claim.

(Plaintiff's Brief at 4-15.)

The Commissioner contends:

1.  Substantial evidence supports the ALJ's findings regarding Plaintiff's severe impairments including her "mood disorder" and PTSD;

2.  Substantial evidence supports the ALJ's credibility finding;

3.  Substantial evidence supports the ALJ's weighing of medical opinions; and

4.  Any alleged "re-opening" presents no basis for remand.

(Defendant's Brief at 7-15.)

In her reply, Plaintiff contends:

1.  Ms. Davis is making more than an argument over semantics concerning the ALJ's Step Two error of not fully and fairly ascertaining her severe impairments;

2.  The ALJ's failure to accurately depict Ms. Davis' Bipolar I Disorder led the ALJ to discredit Ms. Davis based on the very symptoms produced by a Bipolar I disorder; and

3.  Defendant admits that substantial evidence does not support the ALJ's discount of Dr. Thomas.

(Plaintiff's Reply at 1-14.)

## C.   Severe Impairments

As her first claim for relief, Plaintiff asserts that the ALJ failed to evaluate all of her severe

impairments.  Specifically, Plaintiff argues that the ALJ erred by characterizing her bipolar disorder

as a mood disorder. She further states that the ALJ erred by not recognizing PTSD as a severe impairment. (Plaintiff's Brief at 4-6.)

At Step Two of the sequential evaluation, Plaintiff bore the burden of producing proof that she had a severe impairment. Grant v. Schweiker, 699 F.2d 1bender2089, 191 (4th Cir. 1983). However, a mere diagnosis of a condition is insufficient to prove disability; instead, there must be a showing of related functional loss. See Gross v. Heckler, 785 F.2d 1163, 1165 (4th Cir. 1986). "The severity standard is a slight one in this Circuit." Stemple v. Astrue, 475 F. Supp. 2d 527, 536 (D. Md. 2007). An impairment is not severe "only if it is a *slight abnormality* which has such a *minimal* effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education, or work experience." Evans v. Heckler, 734 F.2d 1012, 1014 (4th Cir. 1984) (internal citation and quotation omitted) (emphasis in original); see also 20 C.F.R. § 404.1521(a) ("An impairment . . . is not severe if it does not significantly limit your physical or mental ability to do basic work activities.").

### 1.    Bipolar Disorder

The undersigned finds that it is not at all clear that the ALJ failed to recognize Plaintiff's bipolar disorder as a severe impairment. In her Step Two analysis, ALJ Nagle stated that the "medical evidence of record contains diagnoses by physicians and psychologists of the above-listed impairments." (Id.) Under the regulations, an affective disorder is "characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome." 20 CFR Part 404, Subpart P, Appendix 1, Listing 12.04. In colloquial terms, "[a]n affective disorder" under Listing 12.04 "is a mood disorder." Murphy v. Astrue, No. 2:11-CV-241-NT, 2012 WL 1067683, at *2 (D. Me. Mar. 29, 2012). In the record before the ALJ, the only "affective disorder" specifically identified was

bipolar disorder. Accordingly, by relying on the medical evidence of record to reach the conclusion that Plaintiff suffers from a severe impairment of a "mood disorder," the ALJ surely found that Plaintiff suffers from the severe impairment of bipolar disorder.

Even so, a failure by the ALJ to specifically find a severe impairment of bipolar disorder would not, on the record before the Court, constitute reversible error. A Step Two error is harmless if the ALJ "continued through the remaining steps and considered all of the claimant's impairments." Syms v. Astrue, No 10-CV-499-JD, 2011 WL 4017870, at *1 (D.N.H. Sept. 8, 2011); see also Mauzy v. Astrue, No. 2:08-CV-75, 2010 WL 1369107, at *6 (N.D. W. Va. Mar. 30, 2010) (finding that it was "not reversible error for the ALJ not to designate any of the plaintiff's other medical conditions as severe or not severe in light of the fact that he did, during later steps of the sequential evaluation process, consider the combined effect of all of the plaintiff's impairments"). Here, the ALJ did just that. Accordingly, the undersigned finds no error in the ALJ's decision as to Plaintiff's claims regarding her bipolar disorder.

### 2. PTSD

As noted above, Plaintiff also asserts that the ALJ erred at Step Two by not considering PTSD as a severe impairment. Plaintiff states: "The bottom line is that the record contains a PTSD diagnosis by Dr. Goudy and an affirmation of that diagnosis by Dr. Thomas. . . . The ALJ's decision did not address PTSD. . . . The Appeals Council did not reconcile this evidence." (Plaintiff's Reply at 3.)

Plaintiff did not allege disability due to PTSD, and so the ALJ never considered whether PTSD should be included as one of her severe impairments. The evidence submitted by Plaintiff to the Appeals Council does not establish that Plaintiff was disabled by PTSD for the time period prior

to the ALJ's decision.  See Mitchell v. Schweiker, 699 F.2d 185, 188 (4th Cir. 1983).  Given this, the undersigned finds that the information in Dr. Goudy's report relating to Plaintiff's PTSD is not material to the issue before the ALJ.  If anything, it could be used to buttress a new disability claim filed by Plaintiff asserting disability since January 2013.

To remand for consideration of the evidence regarding Plaintiff's PTSD diagnosis is tantamount to allowing Plaintiff to prosecute a different and later disability claim based on the original disability claim filing date.  In other words, allowing remand would frustrate the appeal process.  The appeal process's purpose is to determine whether the ALJ applied the correct law and did not abuse his or her discretion during the fact-finding process.  See Szubak v. Sec'y of Health & Human Servs., 745 F.2d 831, 833 (3d Cir. 1984).  The line is therefore drawn at the ALJ's decision.  Accordingly, the undersigned finds no error in the Appeals Council's decision to not remand Plaintiff's case to the ALJ for consideration of her PTSD diagnosis.

## D.    Credibility

As her second claim for relief, Plaintiff asserts that the ALJ mischaracterized the record when assessing her credibility.  First, Plaintiff argues that the ALJ's statement that Plaintiff had "not seen fit to take the medications prescribed by her physician" was "entirely arbitrary and capricious and not supported at all by the citations to the record provided by the ALJ."  She also states that by holding Plaintiff to an "arbitrary standard of 'compellingly supportive,'" the ALJ "mischaracterize[d], ignore[d], and discount[ed] the GAF scores."  (Plaintiff's Brief at 7-10.)

The ALJ has a "'duty of explanation'" when making determinations about credibility of the claimant's testimony."  See Smith v. Heckler, 782 F.2d 1176, 1181 (4th Cir. 1986) (citing DeLoatche v. Heckler, 715 F.2d 148, 150-51 (4th Cir. 1983)); see also Hammond v. Heckler, 765 F.2d 424, 426

(4th Cir. 1985). The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citing Tyler v. Weinberger, 409 F. Supp. 776 (E.D. Va. 1976)). This Court has noted that "[a]n ALJ's credibility determinations are 'virtually unreviewable.'" Ryan v. Astrue, No. 5:09CV55, 2011 WL 541125, at *3 (N.D. W. Va. Feb. 8, 2011) (Stamp, J.). If the ALJ meets his basic duty of explanation, "[w]e will reverse an ALJ's credibility determination only if the claimant can show it was 'patently wrong.'" Sencindiver v. Astrue, No. 3:08-CV-178, 2010 WL 446174, at *33 (N.D. W. Va. Feb. 3, 2010 (Seibert, Mag. J.) (quoting Powers v. Apfel, 207 F.3d 431, 435 (7th Cir. 2000)).

In Craig v. Chater, 76 F.3d 585 (4th Cir. 1996), the Fourth Circuit developed a two-step process for determining whether a person is disabled by pain or other symptoms. That process is as follows:

> First, there must be objective medical evidence showing "the existence of a medical impairment(s) which results from anatomical, physiological, or psychological abnormalities and *which could reasonably be expected to produce the pain or other symptoms alleged*." . . . Therefore, for pain to be found disabling, there *must* be show a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce" the actual pain, in the amount and degree, alleged by the claimant.
>
> . . .
>
> It is only *after* a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated. . . . Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings . . .; any objective medical evidence of pain (such as

evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.) . . .; and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it . . . .

Id. at 594-95 (internal citations omitted). An ALJ "will not reject [a claimant's] statements about the intensity and persistence of . . . pain or other symptoms or about the effect [those] symptoms have on your ability to work . . . solely because the available objective medical evidence does not substantiate your statements." 20 C.F.R. § 416.929(c)(2) (alterations in original). Social Security Ruling ("SSR") 96-7p sets out some of the factors used to assess the credibility of an individual's subjective allegations of pain, including:

1.    The individual's daily activities;

2.    The location, duration, frequency, and intensity of the individual's pain or other symptoms;

3.    Factors that precipitate and aggravate the symptoms;

4.    The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms;

5.    Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms;

6.    Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and

7.    Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

SSR 96-7p, 1996 WL 374186, at *3 (July 2, 1996). The determination or decision "must contain specific enough reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reason for that weight." Id. at *2.

As to Plaintiff's credibility, the ALJ stated:

> After careful consideration of the evidence, I find that the claimant's medically determined impairments could reasonably be expected to cause the symptoms the claimant alleges she has. However, I also find that the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible.

(R. at 30.) Neither Plaintiff nor Defendant dispute the ALJ's determination as to the first step of the

Craig analysis. Because the objective medical evidence indicates that Plaintiff does suffer from these

conditions, the ALJ properly assessed the credibility of Plaintiff's testimony about her symptoms.

See Craig, 76 F.3d at 585.

First, the ALJ discussed Plaintiff's daily activities as follows:

> The evidence shows that the claimant is capable of a level of functioning that would permit her to engage in substantial gainful activity. When she has custody of her son, she attends to and completes the tasks of getting him to and retrieving him from school on a daily basis. She prepares daily meals for herself and her son, cleans her household, and does laundry. Even after being evicted and moving in temporarily with acquaintances, the claimant continues to prepare her own food, do her own laundry, tend to the dishwasher, and shop for necessities; she also engages in visitation with her son and occasionally provides childcare for another resident of the house in which she is staying. This level of functioning indicates a capability of performing at least simple, routine, and repetitive tasks on a sustained basis.

(R. at 30-31.) Plaintiff did not challenge this finding in her opening brief. In her reply, however, she

challenged this finding, stating:

> The nature of bipolar I disorder indicates that when the sufferer is on a manic phase then the initiation and completion of tasks such as housework are not uncommon. . . . So, to discredit Ms. Davis simply because she can attend to household tasks (presumably during her manic phases but the ALJ does not so indicate) is to ignore Ms. Davis' overall condition and to ignore the fact that Ms. Davis is going to have the depressive phases during which she may not be able to sustain household chores. . . .
> So, despite trying her best to be the best mother she can be, Ms. Davis apparently cannot sustain taking care of her own son. The ALJ did not paint the entire story when the ALJ found Ms. Davis was able to care for her son. In fact, the ALJ admits that there was not enough evidence to determine if Ms. Davis' symptoms affected her

ability to care for her son. . . . So, instead of further inquiry, the ALJ felt satisfied to discredit Ms. Davis based on an incomplete development of that aspect of the evidence.

(Plaintiff's Reply at 8-9.) The undersigned finds that Plaintiff has waived her challenge to the ALJ's findings regarding her daily activities because she failed to raise it in her opening brief. See Moseley v. Branker, 550 F.3d 312, 325 n.7 (4th Cir. 2008) (citing Cavallo v. Star Enter., 100 F.3d 1150, 1152 n.2 (4th Cir. 1996)) (as a general rule, arguments not specifically raised and addressed in opening brief, but raised for the first time in reply, are deemed waived); see also Steele v. Astrue, No. 5:11CV84, 2012 WL 2069676, at *2 (N.D. W. Va. June 8, 2012) (citing Moseley).

The ALJ also discussed Plaintiff's work history:

> The claimant's work history is more of a neutral factor. While to her credit she has managed to avoid lengthy (yearlong or more) gaps in her employment, which bespeaks a clear ability to engage in work, she also has a consistent record of holding individual jobs for only short periods, which could be interpreted as indicative of poor motivation to work rather than being disabled by her impairments. On the other hand, though, she does allege that at least some of the jobs she has held did not work out for reasons arguably related to her impairments; she contended in her hearing testimony that she was fired from a waitressing job in 2010 for not being able to get along with customers and coworkers, and that she quit a beauty school instructor job in 2008 after feeling overwhelmed and panicked by having to deal with the students. It is significant, however, that the claimant consistently contends she has experienced symptoms of her impairments for many years, dating back to her tees. [Exs. 2F/2, 11F/2, 17F/2.] If this is the case, I must also conclude that the claimant, because she has worked and generated earned income in every year from 1997 through 2010, fundamentally has some functional capacity for work (albeit not unlimited, to be sure), because by her own admission she was impaired during all of that time yet still managed to work.

(R. at 31-32.) Again, Plaintiff did not challenge this finding in her opening brief; however, in her reply, she stated:

> The psychological field finds that a person with Bipolar I Disorder has marked impairment in occupational functioning. . . . Here, Ms. Davis' work history shows two years of employment at the SGA level (1999 and 2000).

39

Further, Ms. Davis may have worked at various jobs at an SGA level for a period of time. However, the record shows that Ms. Davis could not sustain the vast majority of these jobs to the point that she was performing various jobs throughout the years with many different jobs being performed within the same year.

Again, as the Defendant points out, the ALJ used Ms. Davis' work history as a factor in discounting Ms. Davis' credibility. The ALJ is again ignoring the effects of Bipolar I Disorder. Bipolar I Disorder is limiting Ms. Davis from the standpoint that she cannot sustain (or arguably even attain) SGA. The limitatins inherent in Ms. Davis' Bipolar I Disorder are the very evidence that the ALJ is using to discount Ms. Davis' credibility. The ALJ's actions are counter to the commands of SSR 96-7p.

(Plaintiff's Brief at 7-8.) Again, by failing to challenge this finding in her opening brief, Plaintiff has waived her challenge. See Moseley, 550 F.3d at 325 n.7; Steele, 2012 WL 2069676, at *2.

The ALJ considered Plaintiff's credibility regarding the intensity, persistence, and limiting effect of her symptoms by analyzing the GAF scores contained in the medical evidence. Plaintiff argues that by applying an arbitrary "compellingly supportive" burden of proof, the ALJ was able to "arbitrarily mischaracterize, ignore, and discount the GAF scores." (Plaintiff's Brief at 10.) As to Plaintiff's GAF scores, the ALJ stated:

I have also evaluated the claimant's credibility regarding the intensity, persistence, and limiting effects of her symptoms by looking to the Global Assessment of Functioning ("GAF") scores contained in the medical evidence. The claimant consistently has been assessed by her treating physician and her outpatient therapy providers with GAF scores in the 50-60 range. [Exs. 1F/2; 4F/7; 6F/2, 10, 11, 13, 15, 18, 20; 10F/4, 5; 11F/2; 15F/5, 7, 14.] GAF scores of 41-50 are indicative of "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)" and GAF scores of 51-60 are indicative of "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Put simply, the claimant's GAF scores are not compellingly supportive of her claim that her symptoms are disabling, and do not bolster her credibility.

(R. at 32.)

As an initial matter, the undersigned finds that Plaintiff has attempted to take the phrase

"compellingly supportive" out of context by arguing that the ALJ subjected her to a higher burden of proof. When read in context, the undersigned finds that the ALJ used that phrase as a way of stating that Plaintiff's GAF scores were inconsistent with her subjective complaints.

The evidence regarding Plaintiff's GAF scores can be summarized as follows: On April 2, 2007, Dr. Thomas assessed a GAF of 50. (R. at 298.) Her GAF remained the same on September 12, 2007. (R. at 297, 644.) However, on October 17, 2007, Dr. Thomas assessed a GAF of 60. (R. at 296, 645.) Her GAF was back to 50 on January 15, 2008 (R. at 294-95, 646); it was 55 on February 13 and March 14, 2008 (R. at 292-93, 647-48). Dr. Thomas again assessed a GAF of 55 on November 6, 2008. (R. at 289, 308 651.) He assigned a GAF of 50 on February 4, March 4, April 3, June 4, 2009, July 16, 2009, and August 21, 2009. (R. at 370-81.) Plaintiff's GAF was again 50 on March 26, June 3, July 6, and December 29, 2010. (R. at 382-89.) On July 21, 2010, Plaintiff's providers at Mountain State Psychological Services assigned a GAF of 60. (R. at 692-700.) On January 5, 2011, Plaintiff's providers at Mountain State Psychological Services assigned a GAF of 50 when completing a Routine Abstract Form–Mental for Plaintiff. (R. at 401.) On January 21, 2011, Dr. Thomas assessed a GAF of 50. (R. at 425.) He assigned a GAF of 55 on March 2, 2011. (R. at 427.) He again assessed a GAF of 50 on May 26, 2011. (R. at 429.) Plaintiff's GAF remained at 50 on August 24 and December 9, 2012, and February 28, April 9, May 8, and August 9, 2012. (R. at 578-89.)

Given these findings, the undersigned finds that substantial evidence does not support the ALJ's finding that Plaintiff "consistently has been assessed by her treating physician and her outpatient therapy providers with GAF scores in the 50-60 range." (R. at 32.) Rather, the evidence shows that Plaintiff has regularly, with some exceptions, been assigned a GAF of 50, which indicates

either serious symptoms or serious impairment in social, occupational, or school functioning. Accordingly, the undersigned finds that the ALJ's consideration of the intensity, persistence, and limiting effects of Plaintiff's symptoms is not supported by substantial evidence.

Plaintiff also alleges that the ALJ mischaracterized the record with regard to her compliance with medication. On this factor, the ALJ stated:

> The claimant's admitted, documented history of noncompliance with her prescribed medication regimen is more troublesome to her credibility. Her treating physician, Dr. Thomas, has noted repeatedly, when seeing the claimant, that she has been off her medications. [Exs. 1F/1; 6F/10, 13; 15F/5, 10.] In other words, despite complaints of allegedly disabling symptoms, there have been significant periods of time since the alleged onset of her disability during which the claimant has not seen fit to take the medications prescribed by her physician as necessary to control or alleviate those symptoms. This behavior suggests that the symptoms may not have been as limiting as the claimant alleges.

(R. at 32.) Plaintiff argues that the ALJ's determination is not supported "at all by the citations to the record." (Plaintiff's Brief at 8.)

As an initial matter, Plaintiff takes issue with some of the ALJ's pin cites, arguing that those cites made no mention of Plaintiff not taking her medication. However, the undersigned agrees with the Government that the ALJ committed scrivener's errors by pin citing the wrong pages. Such scrivener's errors do not provide grounds for remand. See, e.g., Moore v. Astrue, No. 0:06-3514-HFF-BM, 2009 WL 216605, at *5 (D.S.C. Jan. 24, 2008).

The medical evidence regarding Plaintiff's compliance with her treatment record can be summarized as follows: On October 2, 2008, Plaintiff told Dr. Thomas that she had not had Depakote for two (2) weeks because she had only been able to afford Seroquel. (R. at 290.) However, on February 13, 2008, Dr. Thomas had noted that Plaintiff had "finally got a medical card" for her medications. (R. at 293.) On October 2, 2008, Dr. Thomas prescribed a month's worth of

medication. (R. at 290.) Nevertheless, on November 6, 2008, Plaintiff told Dr. Thomas that she had not had her medications for two (2) weeks because they had been stolen from a truck. (R. at 289, 308.) That same day, Dr. Thomas advised Plaintiff to see him again in one (1) month. (Id.) However, Plaintiff did not return until March 4, 2009. (R. at 372.)

Likewise, on July 16, 2009, Plaintiff informed Dr. Thomas that she had not had her medications for six (6) weeks because they "came up missing and she [thought] someone got into her vehicle and took them." (R. at 378.) As Dr. Thomas noted, Plaintiff never contacted him to obtain refills. (Id.) On August 21, 2009, Dr. Thomas instructed Plaintiff to return in two (2) months (R. at 381); she did not do so until March 26, 2010 (R. at 382). At that visit, Plaintiff admitted that she had "been without her meds for a few months." (Id.) On July 6, 2010, Dr. Thomas told Plaintiff to come back in six (6) to eight (8) weeks (R. at 387); she did not return to see him until December 29, 2010 (R. at 389, 422). At that time, Plaintiff told Dr. Thomas that she had not had her medications for "about" three (3) months. (Id.) Subsequently, on May 26, 2011, Dr. Thomas told Plaintiff to return in one (1) month. (R. at 576-77.) She did not see him again until August 24, 2011; at that visit, Dr. Thomas noted that he would talk to Plaintiff's therapist to "help try to keep her compliant with [follow up] as she hasn't been here since May." (R. at 578-79.) On December 9, 2011, Dr. Thomas noted that Plaintiff had not "been back for a while." (R. at 580.) Finally, on April 9, 2012, Plaintiff informed Dr. Thomas that she had refilled her medication, but that "someone robbed her house so she didn't get the meds." (R. at 584.)

The undersigned notes that a claimant's "statements may be less credible if the level of treatment is inconsistent with the level of complaints, or if the medical reports or records show that the individual is not following the treatment as prescribed and there are no good reasons for this

failure." SSR 96-7p, 1996 WL 374186, at *9. However, such noncompliance "must be handled with caution before using it against a claimant." Croarkin v. Colvin, No. 12 C 7819, 2014 WL 274054, at *7 (N.D. Ill. Jan. 24, 2014).[2] Rather, SSR 96-7p warns that an ALJ must "not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanation that the individual may provide, or other information in the case record." SSR 96-7p, 1996 WL 374186, at *9.

The ALJ did not comply with this requirement of SSR 96-7p. ALJ Nagle extensively questioned Plaintiff about her prescribed medications; however, this line of questioning concluded with the following colloquy:

> Q:     And were there periods when you weren't taking your medication.
>
> A:     Yes, I've had those moments.
>
> Q:     Like for a month or a few months at a time?
>
> A:     It would never be any more than two months at a time.

(R. at 75.) However, ALJ Nagle never questioned Plaintiff as to why she had long periods of time where she went without seeing Dr. Thomas, nor did she question Plaintiff as to why she would go months without her medications. The record "should have alerted the ALJ that the issue was especially important in this case." Croarkin, 2014 WL 274054, at *8. Put simply, the medical evidence discussed above should have led the ALJ to ask Plaintiff about her noncompliance before using it to discount her credibility. Cf. Craft v. Astrue, 539 F.3d 668, 679 (7th Cir. 2008) (stating that an ALJ must first explore a claimant's explanations concerning a failure to seek medical care before using that fact to discount credibility).

---

[2] The undersigned notes that ALJ Nagle was also one of the presiding ALJs in Croarkin.

In sum, the undersigned finds that the ALJ did not comply with <u>Craig</u> and SSR 96-7p when assessing Plaintiff's credibility. While ALJ Nagle discussed Plaintiff's alleged noncompliance with treatment and medication, she failed to ask Plaintiff about such noncompliance before using it to discount her credibility. Furthermore, the undersigned finds that ALJ Nagle mischaracterized the record regarding Plaintiff's GAF scores by noting that Plaintiff "consistently has been assessed by her treating physician and her outpatient therapy providers with GAF scores in the 50-60 range." Given these findings, the undersigned has determined that substantial evidence does not support the ALJ's credibility determination.

### E.     Treating Source Opinion

As her third claim for relief, Plaintiff asserts that the ALJ "circumvented" the treating physician rule. Specifically, she argues that the ALJ "provided insufficient reasons for discounting the opinion of Dr. Thomas." According to Plaintiff, Dr. Thomas' opinion was supported by Dr. Goudy's opinion. She further argues that treating source opinions do not require objective evidence to "bolster the credibility of the opinion," and that the ALJ's mischaracterization infiltrated her evaluation of Dr. Thomas' opinion. (Plaintiff's Brief at 11-13.)

The undersigned has already determined that the ALJ's determination regarding Plaintiff's credibility is not supported by substantial evidence. As noted above, the ALJ erred by using Plaintiff's alleged noncompliance with treatment and medication to discount her credibility without asking her about her noncompliance. The ALJ relied on this determination in her discussion of Dr. Thomas' opinion, stating:

> The persuasiveness of his opinion is further diminished by its failure to acknowledge or account for the claimant's intermittent but repeated episodes of noncompliance with the medications he has prescribed for her. Dr. Thomas' own treatment notes often prominently mention the claimant's failures to keep current with her

medications, undoubtedly indicating that he believes better adherence to her medication regimen would make a beneficial difference in her functional abilities. Failing to address in his opinion whether its drastic limitations would apply if the claimant–as required by 20 CFR §§ 404.1530(a) and 416.930(a)–followed her prescribed course of treatment renders it less reliable as an assessment of her maximum functional capacity.

(R. at 33.) The undersigned also agrees with Plaintiff that the ALJ's statement as to Dr. Thomas' belief is pure conjecture. If this had been the only error the ALJ had made in discounting Dr. Thomas' opinion, the undersigned would have viewed it as harmless. See Baker v. Colvin, No. 1:12-2534-SVH, 2014 WL 608442, at *11 (D.S.C. Feb. 14, 2014). However, given that the ALJ's error in assessing Plaintiff's credibility influenced her analysis of Dr. Thomas' opinion, the undersigned finds that substantial evidence does not support the assignment of "little weight" to this opinion.

Plaintiff also argues that Dr. Thomas' opinion is supported by Dr. Goudy's opinion. Of course, the ALJ did not have the benefit of Dr. Goudy's opinion, as Plaintiff submitted it after the ALJ rendered her decision. Nevertheless, the undersigned has construed Plaintiff's statements as an assertion that the Appeals Council erred by failing to remand her case to the ALJ for consideration of Dr. Goudy's opinion.

In Wilkins v. Sec'y, Dep't of Health & Human Servs., 953 F.2d 93, 95-96 (4th Cir. 1991), the Fourth Circuit determined that the Appeals Council must consider additional evidence that was not submitted to the ALJ if the evidence is (1) new, (2) material, and (3) relates to the period on or before the date of the ALJ's decision. "New evidence is evidence which is not duplicable or cumulative. Evidence is 'material' if there is a reasonable possibility that it would have changed the outcome." Id. at 96. Evidence relates to the period on or before the date of the ALJ's decision if it provides evidence of a plaintiff's impairments at the time of the decision. See Johnson v. Barnhart, 434 F.3d 650, 655-56 (4th Cir. 2005).

In the report submitted to the Appeals Council, Dr. Goudy found that Plaintiff's immediate memory was normal, recent memory was moderately to markedly impaired, and remote memory was mildly to moderately impaired. Her concentration was markedly appeared given her "very poor[]" performance on recitation of serial sevens. (R. at 706.) Dr. Goudy administered the BDI–II, which indicated that Plaintiff suffered from moderate levels of depression. (Id.) The BAI indicated moderate anxiety, while the PDS confirmed a diagnosis of PTSD, which severely impaired Plaintiff's functioning. Plaintiff's performance on the MMPI-2 produced a "7-2-8" code type, which "strongly reflect[ed] a long history of chronic psychological maladjustment." (R. at 707.) Dr. Goudy diagnosed PTSD, chronic; Bipolar I Disorder, severe, without psychotic features; panic disorder without agoraphobia; and polysubstance dependence, in sustained full remission per patient's report. (R. at 708.) As to functional limitations, Dr. Goudy opined that Plaintiff was mildly to moderately impaired in activities of daily living and markedly impaired in social functioning and concentration, persistence, and pace. (R. at 709.) As for decompensation, Dr. Goudy noted that Plaintiff had had three (3) suicide attempts and one (1) psychiatric hospitalization. (R. at 710.)

A report may be new evidence even when the information contained in the report is similar to information already introduced. See Venters v. Astrue, No. TMD 08-1736, 2010 WL 481246, at *3 (D. Md. Feb. 4, 2010). While Dr. Goudy's opinion substantially mirrors the opinion given by Dr. Thomas, Dr. Goudy's findings directly contradict the ALJ's findings. For example, the ALJ discredited Dr. Thomas' opinion for finding that Plaintiff was "markedly limited in all mental functional capacities." (R. at 32-33.) However, Dr. Goudy agreed with Dr. Thomas that Plaintiff's social functioning, concentration, persistence, and pace were markedly limited. Dr. Goudy also opined that "the increased stress of a return to work would likely result in significant deterioration

or even decompensation." (R. at 710.) Accordingly, because the report contradicts previous findings, it is neither duplicative nor cumulative. As such, the undersigned finds that it is new evidence under <u>Wilkins</u>.

Dr. Goudy's report is also material. The ALJ found that Plaintiff was not credible and "accordingly did not fully accept [her] subjective statements concerning h[er] symptoms and limitations." <u>Boggs v. Astrue</u>, No. 2:12-CV-25, 2012 WL 5494566, at *4 (N.D. W. Va. Nov. 13, 2012). However, the undersigned has already found that the ALJ erred in her assessment of Plaintiff's credibility and that such error influenced her discussion of Dr. Thomas' opinion. As noted above, Dr. Goudy's opinion substantially mirrors Dr. Thomas' opinion, thereby providing support for both Dr. Thomas' opinion and Plaintiff's credibility. Accordingly, Dr. Goudy's report creates a conflict and calls into question the ALJ's decision regarding Plaintiff's credibility and her treatment of the opinion evidence.

Even so, the undersigned must consider whether this report should be considered because Dr. Goudy did not evaluate Plaintiff until approximately three (3) to four (4) months after the ALJ's decision. While his report clearly postdates the ALJ's decision, "<u>Wilkins</u> does not impose a bright line test based on the date of the test akin to a statute of limitations." <u>Camper v. Barnhart</u>, No. 7:04 CV 00403, 2005 WL 1995446, at *7 (W.D. Va. Aug. 16, 2005), <u>amended</u> 2005 WL 2105025 (W.D. Va. Aug. 29, 2005); <u>see also</u> <u>Boggs</u>, 2012 WL 5494566, at *5 (applying <u>Camper</u> to determine that a test completed over three months after the ALJ's decision related "to the period of time the ALJ evaluated"). Rather, the issue becomes whether the new and material evidence "relat[es] to the period on or before the date of the ALJ decision." <u>Wilkins</u>, 953 F.2d at 95. With the exception of Dr. Goudy's diagnosis of PTSD, the relation between the remainder of his report and the period

before the ALJ is clear in this case. Dr. Goudy's report confirms the opinion of Dr. Thomas. There is no mention in Dr. Goudy's report or by either party that there have been any recent changes to Plaintiff's conditions. Given the short period of time between the ALJ's decision and Dr. Goudy's report, it is clear that the Commissioner needs to fully evaluate this evidence when reconsidering the weight to be assigned to Dr. Thomas' opinion.

As noted above in the undersigned's discussion of the ALJ's Step Two analysis, Plaintiff has relied on Dr. Goudy's report to argue that the ALJ erred by not including PTSD as a severe impairment. However, the undersigned has already determined that the portion of Dr. Goudy's report concerning PTSD should not relate to the period before the ALJ's decision, as there was no diagnosis of PTSD until Dr. Goudy's diagnosis. Nevertheless, with the exception of the portion of Dr. Goudy's report concerning PTSD, the undersigned recommends that Plaintiff's case be remanded to the Commissioner to weigh and resolve the evidence reflected in Dr. Goudy's report.

## F.     Reopening of a Prior Claim

As her last claim for relief, Plaintiff asserts that she was denied her right to due process "by the ALJ failing to reopen the prior claim without explaining why a reopening could or could not occur." (Plaintiff's Brief at 15.) Specifically, Plaintiff states as follows:

> The ALJ provided no discussion of any reopening issues within the body of her decision. . . . The ALJ relied on the evaluation of Ms. Cosner-Shepherd when denying Ms. Davis. . . . The ALJ then wholly discounts any evidence from 2007 (that was submitted by Ms. Davis' prior Counsel) to have "little evidentiary value, if any."

> The ALJ was entirely arbitrary and capricious in addressing a reopening: the ALJ ignored 20 CFR § 404.988 (the rules for reopening a prior claim); the ALJ utilized evidence from the prior claim to deny Ms. Davis (indicating that the ALJ felt that the evidence was relevant to the current claim); the ALJ found evidence from 2007 that was submitted by Ms. Davis' prior Counsel to have no evidentiary value at all to the current claim.

> So, a reviewing Court has before it a case where the ALJ did not indicate that she reopened a prior claim yet utilized evidence from the prior claim to deny Ms. Davis. Ms. Davis has no way to determine what evidence the prior claim contained that could potentially conflict and outright contradict the findings of consultative examiner Cosner-Shepherd.

(Id. at 14-15.) According to Plaintiff, "this Court has before [it] a claim that amounts to a de-facto reopening that must be remanded so the Secretary can account for all of the evidence emanating from the prior file." (Id. at 15.) The undersigned has already determined that substantial evidence does not support the ALJ's determination regarding Plaintiff's credibility and her assignment of "little weight" to Dr. Thomas' opinion. Having found that, the undersigned does not address Plaintiff's contention regarding an alleged *de facto* reopening of her prior claim for benefits.

## V.    CONCLUSION

Upon consideration of all the above, the undersigned United States Magistrate Judge finds and concludes that substantial evidence does not support the ALJ's determination that Plaintiff was not disabled during the relevant time period, and recommends that the case be reversed and remanded for the Commissioner to reconsider the determination on Plaintiff's credibility and the weight assigned to the opinion of Plaintiff's treating doctor, Dr. Thomas. The undersigned also concludes that remand is necessary for the Commissioner to take into consideration Dr. Goudy's report, with the exception of information related to Plaintiff's PTSD, concerning his consultative examination of Plaintiff.

## VI. RECOMMENDATION

For the reasons herein stated, I find substantial evidence does not support the Commissioner's decision denying the Plaintiff's applications for DIB and for SSI. I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED,** and the Plaintiff's Motion

for Summary Judgment be **GRANTED IN PART** and this action be **REMANDED** to the Commissioner for further action in accordance with this Report and Recommendation.

Any party may, within fourteen (14) days after being served with a copy of this Report and Recommendation, file with the Clerk of the Court written objections identifying the portions of the Report and Recommendation to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Frederick P. Stamp, Jr., United States District Judge. Failure to timely file objections to the Report and Recommendation set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such Report and Recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to provide a copy of this Report and Recommendation to counsel of record.

Respectfully submitted this *16* day of *October* , 2014.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE